UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | | | |
|---|---|---|---|
| Case No. | **SACV 23-0363 JGB (JDEx)** | Date | August 14, 2026 |
| Title | ***Tiffanie Dawn Johnson v. Wal-Mart Associates, Inc., et al.*** | | |

| | |
|---|---|
| Present: The Honorable | JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE |

| | |
|---|---|
| MAYNOR GALVEZ | Not Reported |
| Deputy Clerk | Court Reporter |

| | |
|---|---|
| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
| None Present | None Present |

**Proceedings: FINDINGS OF FACT AND CONCLUSIONS OF LAW (IN CHAMBERS)**

Plaintiff Tiffanie Dawn Johnson ("Plaintiff" or "Johnson") brought this action against Defendants Wal-Mart Associates, Inc. ("Defendant" or "Wal-Mart") and Does 1-50. Plaintiff, in her Complaint filed on March 1, 2023, alleged six causes of action: (1) failure to provide overtime wages in violation of California Labor Code ("CLC") § 510; (2) failure to provide meal breaks in violation of CAC § 226.7; (3) failure to provide rest breaks in violation of CLC § 226.7; (4) failure to maintain accurate itemized wage statements in violation of CLC § 226(a); (5) failure to provide minimum wages in violation of CLC § 1194; and (6) unlawful business practices under California Business and Professions Code § 17200, et seq. ("Complaint," Dkt. No. 1.)

On June 9, 2026, the case was tried before the Court without a jury. The Court ordered the parties to submit proposed findings and conclusions of law by July 9, 2026. Both parties timely filed their proposed findings of fact and conclusions of law on July 9, 2026. (Dkt. Nos. 92-93.)

The Court, having considered all the evidence presented by the parties, the written submissions from both sides, and the argument of counsel, issues the following Findings of Fact and Conclusions of Law.

## I. FINDINGS OF FACT

Defendant employed Plaintiff beginning in 1995. In 2003, she was promoted to assistant manager. From 2017 until the end of her employment, Plaintiff was an assistant manager and

later her title was changed to night coach. Johnson spent about 90% of her time performing physical labor, including straightening the store front, cleaning, making the floors look good, sorting products to be returned to the shelves, and getting products ready to be returned to the shelves. Plaintiff spent about 10% of her time on managerial tasks. Plaintiff was paid a salary and classified as an exempt employee in her assistant manager and night coach roles, and during the relevant times her monthly salary was at least twice the state minimum wage for full-time employment.

Prior to starting as an assistant manager, Plaintiff underwent seventeen weeks of paid, full-time management and leadership training. This training covered various topics including hiring, training, and supervising associates; ensuring associates followed defendant's policies and procedures; disciplining and coaching employees; delegating responsibilities as a manager; scheduling; and monitoring overtime. After this initial training, Plaintiff did approximately 25 ongoing training courses throughout her employment.

Plaintiff's job description as an assistant manager included responsibilities like "hiring, training, mentoring, assigning duties, evaluating performance, providing recognition, and ensuring diversity awareness" for hourly associates. The role also involved driving the financial performance of the store. As a coach, Plaintiff's job description involved leading and developing her team, modeling and demonstrating customer service standards to store associates, driving financial performance, and providing supervision and development for hourly associates by hiring, training, and mentoring associates. When Plaintiff became an overnight coach, she was provided with a job description that instructed her to lead and develop teams effectively by "teaching, training, and actively listening to associates; touring stores and providing feedback." A supplemental coach guide also contained a description of a "teaming day in the life of a coach" that included providing role clarity to teams when needed, developing team leads and scheduling time with them to review areas for support, confirming associates' understanding of team goals and expectations, and connecting with team leads to understand problems and work on finding solutions.

Plaintiff's job involved performing the duties set forth in the assistant manager and coach job descriptions, and other tasks. On a daily basis she would meet with everybody on her team, find out who had called out, and do a walk-through of the store to check conditions of the store. She would assign tasks to her team members. She would also try to develop her team members to be more efficient. Plaintiff was the person in charge during her shifts. Fifteen associates were generally assigned to her team, with thirteen scheduled on any given shift. Sometimes as few as eight people actually arrived for a shift, but more than two people who worked under her were always there. On multiple occasions, Plaintiff emailed her team with task assignments for their shifts. Plaintiff would also text associates with directions.

Plaintiff's job description for the assistant manager and coach roles involved using appropriate judgment. She would have to use her judgment to determine how to complete the amount of work expected to be completed in Defendant's estimates of workload. That judgment involved trying to stay in-budget. If there was an emergency or safety issue, she would have to

take care of it. Wal-Mart expected that Plaintiff would spend the majority of her time engaged in management duties. Plaintiff believed this expectation was unrealistic.

Plaintiff was not allowed to approve overtime without approval from her manager. Plaintiff did not control the schedule of the people who reported to her. She could, however, call people to find someone to come into work if someone called out and the team was short-staffed. Plaintiff would identify candidates among applicants for open jobs and Human Resources would schedule interviews. She conducted some interviews. She would use her own independent judgment and discretion to determine who might be a good candidate. Plaintiff could not hire or fire anyone without manager approval. Plaintiff issued coaching to employees for violating policies, including climbing on structures in the store. She formally coached multiple employees while she was an assistant manager and coach. Plaintiff would need to consult with her head store manager. Plaintiff also terminated associates, including for attendance issues.

In one email to Plaintiff and other managers, sent in January 2021, Ricardo Flores, Plaintiff's Store Manager and supervisor, wrote that he asked for a task to be "delegated by coach's [sic]" and "[i]f not completed my expectation is you jump in and help." Plaintiff would jump in and do a task to help an associate learn how to do it more efficiently. On Flores's last day, he saw Plaintiff moving pallets.

Luis Gonzalez, an acting store manager, wrote in an email that he had directed Plaintiff "to stop locating bins and actually pulling picks to make room for new O/S[,]" which was a reference to getting a handheld terminal, going to the back of the store, scanning merchandise, putting it out on the floor, putting it on the shelf, and then coming back to remove merchandise off the pallets and scanning it into bins so it can be located for customers. Plaintiff took photos of the store in a state of disarray to show Flores what she had to deal with at the store before she could take care of the tasks he assigned to her.

From 2017 to 2020, she was rated on her reviews as a "solid performer," which is a step below the highest level, exceeds expectations. Her performance for the last two years of her employment was rated "meets expectations," which was below "solid performer." On February 4, 2021, Flores disciplined Plaintiff for her struggles with "turning over acceptable standards in the backroom conditions and sales floor merchandising." Plaintiff was also counseled on "planning and holding people accountable for the backroom issues." Under "Behavior Expected of Associate" Flores wrote:

> Tiffanie needs to utilize the planning tools to make effective decisions. This includes developing sound action plans to deliver results through her team. Have tough documented discussions with underperforming associates. Use the planning tools to provide feedback to your daily team on a daily basis. Tiffanie must walk the store in detail each shift and make critical decisions to ensure her team is in the best position to succeed each day.

On October 3, 2021, Plaintiff was disciplined for her job performance and productivity. That disciplinary action noted that Flores had previously admonished Plaintiff on multiple occasions. Flores had spoken to Plaintiff on May 28, 2021, about "managing team performance, store standards and expectations." On July 27, 2021, Flores had admonished Plaintiff about overstock verification in the store and "expected that overstock verification was communicated and documented for both Team Leads and associates." On September 24, 2021, Flores had discussed with Plaintiff her development action plan and Plaintiff agreed to update the plan with "timelines to bring the Overnight Productivity standards to business expectations within two weeks." On Flores's last day, he told Plaintiff that he was being let go and that he had made Plaintiff his "fall guy."

Valerie Perez was a general merchandise coach and worked with Plaintiff in 2021, for less than a year. Perez typically worked morning shifts, though her schedule varied. When Perez overlapped with Plaintiff at work, she saw Plaintiff pulling pallets, counting pallets, and doing power lifting equipment verification "[a] few times, a little bit." When someone named Naomi would work in Plaintiff's place on the night shift, Perez would see that the store was left in better condition when Perez would arrive in the morning.

When Perez was a night coach, after Plaintiff was terminated, she pulled freight half the nights she worked. When Perez was a night coach, "it varied" how often she was shorthanded, but was shorthanded "at least half the nights." On nights where she was shorthanded, she would step in to help stock shelves "if she felt like it." After Perez had finished her managerial duties as a general merchandise coach, she could decide to help someone out or do nothing. The planning part of Perez's job did not take too long, so the majority of her time was spent helping or training associates, including stocking shelves if associates needed to be trained on that. During Perez's time as a night coach, she could not fire associates because only their direct supervisors—who were themselves under Perez's supervision—could do that. Perez never worked a night shift with Plaintiff, so she only overlapped with Plaintiff by two to four hours on any given shift. For eight to ten hours of any shift, she did not know what Plaintiff was doing. Perez had to unlock the doors to the store to let associates inside from lunch.

During the nine months Perez was an overnight coach, she hired roughly ten associates and interviewed more than 20 people, though this time period coincided with the holidays when more people were hired. Perez estimated that she spent about 80% of her time teaching, training, and developing associates and team leads.

Jordon Hurtado worked as a market coordinator for Defendant during Plaintiff's employment. In that role, she only visited Plaintiff's store three to four times per month. She only visited Plaintiff's store during the day and could not testify as to what Plaintiff did at night. Most of Hurtado's interactions with Plaintiff happened when Hurtado was an assistant manager from September 2019 to September 2020. Hurtado saw Plaintiff stock shelves as a fairly regular occurrence, about 20 to 50 times. She saw Plaintiff pulling pallets and wrapping pallets perhaps more than 30 times. Hurtado herself put products on shelves and pallets on the floor, albeit "very rarely." She also built and broke down displays. These actions were not in her job

description. Hurtado did not remember a specific instance where she saw Plaintiff sitting in their shared office. Hurtado was aware that Plaintiff would lock and unlock doors for other employees during meal and rest breaks. Hurtado saw that the store was in worse condition on nights Plaintiff was working compared to nights she was not. Specifically, Hurtado noticed that the store was in better condition on nights when Naomi would work on the night shift in place of Plaintiff. Hurtado did not report the poor conditions to Plaintiff's supervisors because she was not her supervisor, and thought that the supervisors would see the conditions. Hurtado also occasionally covered the night shift as an assistant manager and spent a majority of her time engaged in exempt tasks.

Hurtado was in charge of disciplining associates and did not have to seek input from Flores in order to do so when she was an assistant manager. She also terminated roughly 40 people during her time as an assistant manager and coach. She estimated that she spent about 50 to 75 percent of her time managing her team members.

Annchalee Reitz was Plaintiff's friend and co-worker at the store where they worked. Reitz was Plaintiff's supervisor for a period of time when Plaintiff was an assistant manager, from 2005 to 2009. As Plaintiff's supervisor during that period, Reitz expected Plaintiff to be hands-on and to jump in and do the work that needed to get done. During that period, everyone jumped in and did what needed to be done, based on the expectations of the company and supervisors. Between 2019 and 2021, Rietz had stepped down from her supervisory position because she was planning to retire. She was an associate during that period. Plaintiff was her assistant store manager, and then her title changed to coach. During that time, Reitz saw Plaintiff do physical labor, including working freight, stocking shelves, pulling pallets, and building and tearing down displays. Reitz saw Plaintiff do this "often[,]" but it varied depending on the workload each day and the among of freight that came in on any given night. Reitz also saw Plaintiff use a forklift, throw out trash, use the compactor, and put products back where they belong in the back room. Sometimes the daytime shifts did not finish their work and would leave it for the night shift.

Sergio Gonzalez worked for Defendant's store where Plaintiff worked for four years, starting in 2019 or 2020 as a stocker. Gonzalez saw Plaintiff at work three times a week. Between 2019 and 2021, Gonzalez could not complete all of the tasks Plaintiff assigned to him before the end of his shift. The store was sometimes short-staffed during this period, five days a week. Between 2019 and 2021, Gonzalez saw Plaintiff stock freight and unload things, among other physical tasks. On the three days a week Gonzalez saw Plaintiff at work, he would see her stock shelves. During that period he also saw Plaintiff return things to the back room and put products back where they belonged in the store.

Roxanne Sanders was a market manager for Defendant starting in 2020. Sanders discussed with Plaintiff why she couldn't get the trucks finished and store cleaning completed. Plaintiff told her that she did not have enough associates, she did not have enough hours, there was too much freight, the associates could not get freight completed, and the associates were not working fast enough and she could not figure out how to get them to work faster. Sanders did not know there were associates with work restrictions on Plaintiff's shift. Sanders expected Plaintiff

to be planning and ensuring the work assigned to the store was executed. When a store was in bad condition, Sanders expected that the assistant manager or coach would be supervising and managing associates to ensure they would complete their tasks.

On October 11, 2021, manager Luis Gonzalez covered Plaintiff's store following Flores's separation. He emailed Sanders that he "addressed Tiffanie in regards to the performance of her team" and wrote that Plaintiff's "engagement was non existent, she would always reference her [Team Lead] for an answer. Tiffany was given direction from me to hire stocking TA to get the team where it needed to be." On November 8, 2021, Valerie Pineda—the new permanent store manager—emailed Sanders that she "had a conversation with Overnight Coach Tiffanie Johnson about her performance and her lack of teaching training and developing her team leads." She also wrote that Plaintiff was "[n]ot meet [sic] company stocking exception [sic] and not being able to turn a truck with the hours given and the number of associates on a nightly basis."

Plaintiff was terminated on November 19, 2021 due to "[u]nsatisfactory [j]ob [p]erformance." In an internal termination document, Pineda wrote that "Tiffanie has not been able to perform and meet company expectations, by not teaching, training and developing her team leads to perform at a store lead. By her guidance she has not met the stocking times at night and been able to complete process guide." She was paid out $3,104.41 upon her termination and signed a document stating that she had "reviewed the above pay stub in its entirety and certify that I have received the payment of wages and other pay currently due."

## II. CONCLUSIONS OF LAW

### A. Jurisdiction

The Court has subject matter jurisdiction over the parties in this case pursuant to 28 U.S.C. § 1332.

### B. Plaintiff Did Not Qualify for the Executive and Administrative Exemptions

Under California law, an employee qualifies for the executive exemption where the employee:

- has duties and responsibilities involving the management of the enterprise in which they are employed or of a customarily recognized department or subdivision thereof
- customarily and regularly directs the work of two or more other employees
- has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring or firing and as to the advancement and promotion or any other change of status of other employees will be given particular weight
- customarily and regularly exercises discretion and independent judgment;
- is primarily engaged in duties which meet the test of the exemption; and
- earns a monthly salary equivalent to no less than two times the state minimum wage for full-time employment.

Cal. Code Regs., tit. 8 § 11070(1)(A)(1).

In addition to the executive exemption, there is also an administrative exemption. That exemption occurs where the employee:

- Is engaged in the performance of office or non-manual work directly related to management policies or general business operations of their employer or their employer's customers
- Customarily and regularly exercises discretion and independent judgment; and
- Regularly and directly assists a proprietor, or an employee employed in a bona fide executive or administrative capacity (as such terms are defined for purposes of this section); performs under only general supervision work along specialized or technical lines requiring special training, experience, or knowledge; or executes under only general supervision special assignments and tasks;
- Is primarily engaged in duties that meet the test of the exemption; and
- Earns a salary equivalent to no less than two times the state minimum wage for employment.

Cal. Code Regs., tit. 8 § 11070(1)(A)(2). Duties falling under the administrative exemption and the executive exemption may be combined to determine the full scope of an employee's exempt work, even if administrative or executive duties on their own would be insufficient. 29 C.F.R. § 541.708.

Under California Labor Code § 515(e), "primarily engaged in" means more than fifty percent of an employee's work time. California has adopted a non-exhaustive list of managerial tasks promulgated in federal reulgations. Id. That list includes:

> [I]nterviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102. California courts have determined that identical tasks may be either exempt or nonexempt "based on the purpose they serve within the organization or department." Batze v. Safeway, Inc., 10 Cal. App. 5th 440, 474 (Cal. Ct. App. 2017), as modified on denial of reh'g

(May 3, 2017) (internal citations omitted). By way of example, "[a] task performed because it is 'helpful in supervising the employees or contribute[s] to the smooth functioning of the department' is exempt, even though the identical task performed for a different, nonmanagerial reason would be 'nonexempt.'" Id.

Plaintiff spent more than half of her time doing non-exempt work. Plaintiff testified that she spent 90% of her time doing manual labor, and only 10% of her time on managerial tasks. While demonstrating various manual labor tasks may have comprised of some small portion of Plaintiff's actual work, which would qualify such work in that context as exempt, in reality she was simply performing the same manual labor as her non-exempt team members a substantial portion of the time, and not for demonstrative purposes. While there is evidence that Plaintiff would direct the work of other employees, that does not undermine her testimony because Plaintiff did not testify that she did *no* exempt work. Instances of managing other employees and sending text messages to other employees to do tasks, while such work qualifies as exempt, does not contradict her broader testimony that only about 10% of her work involved exempt, managerial tasks.

**C. Plaintiff Did Not Qualify As Exempt Under the Realistic Expectations Test**

Where an employee spends more than half of her time on non-exempt work, the Court is to consider "whether the employee's practice diverges from the employer's realistic expectations, whether there was any concrete expression of employer displeasure over an employee's substandard performance, and whether these expressions were themselves realistic given the actual overall requirements of the job." Id. at 475 (internal citation omitted).

The extent of Plaintiff's non-exempt work diverged from Defendant's expectations, though whether those expectations were realistic is a separate matter. It is clear that Plaintiff's job descriptions, while they make some references to capacity to engage in manual labor, were primarily focused on management and direction of employees who worked under Plaintiff. Plaintiff was also trained for an extensive period of time on how to be a manager. Had Plaintiff actually done the work as reflected in her job descriptions, it is very likely that she would be found to be exempt. Her job descriptions, and Defendant's intentions for a person in Plaintiff's roles, involved managing her team, directing others' actions, training associates, and playing a role in hiring and firing. Plaintiff did these tasks, but not in the proportion that Defendant expected.

Based on Hurtado's, Perez's, Rietz's, and Sanders's testimony, there were assistant managers and night coaches who were capable of successfully completing their jobs doing primarily exempt work. Thus, under *certain* conditions, it was certainly realistic for Defendant to expect an assistant manager or night coach to engage in primarily exempt tasks. But Plaintiff was not working under the same conditions as did Hurtado and Perez. Hurtado worked on the day shift from September 2019 to September 2020, during which Plaintiff worked at night. Hurtado therefore did not have precisely the same role as Plaintiff, nor did she work with the same employees as did Plaintiff. Hurtado's ability to meet expectations in her role by doing primarily

exempt work does not establish the feasibility of Plaintiff doing so under her work conditions. This is so even if Hurtado was successful at doing primarily exempt tasks on the occasional nights she would cover the overnight shift—it does not establish the norm for Plaintiff's daily experience. Similarly, Perez was a night coach after Plaintiff was terminated. Her testimony about the frequency with which she did manual labor reflected that it was likely less than half the time. Perez worked under a different store manager than Plaintiff. Plaintiff's store manager for the bulk of her employment was Flores. Plaintiff testified that Flores was let go just before she was, and had told her that she was his fall guy. This indicates that Flores's actions and job performance may have contributed to the conditions in the store under which Plaintiff worked, which may have altered what can be considered realistic expectations for a person in Plaintiff's role to be able to do primarily exempt work.

Perez's experience under a different store manager, and Hurtado's experience in a different role than Plaintiff with occasional overnight coverage, do not establish that Defendant's expectations of Plaintiff were realistic, even if Perez and Hurtado were able to satisfactorily do their jobs with primarily exempt tasks. That Perez and Hurtado noted that a woman named Naomi left the store in better condition on nights she worked in Plaintiff's place also does not provide any evidence to indicate that Defendant's expectations were realistic with respect to how much of the work should have been exempt tasks. It is entirely unknown what Naomi was doing during her shifts and whether her doing less, or perhaps more, non-exempt tasks than Plaintiff is what made the difference in the store conditions.

Even assuming, however, that Defendant's expectations could have been realistic, Plaintiff was not disciplined for the first time until February 2021, after receiving at minimum "meets expectations" evaluations, and often higher, for the preceding relevant period. There is no evidence that Defendant ever made Plaintiff aware of any displeasure with her performance before February 2021, such that Plaintiff could be expected to know that her amount of exempt versus non-exempt work was not in line with Defendant's expectations for an individual in her position. Nor is there any evidence that Defendants were unaware of the scope of the non-exempt tasks in which Plaintiff was engaged. For example, Plaintiff introduced photos that she sent to Flores showing that she had been arranging products on shelves in the store.

When Plaintiff was disciplined, Flores's feedback emphasized that Plaintiff had struggled with planning and prioritizing the store's workload, leading to her team's failure to complete certain tasks. She was found to be deficient at holding employees accountable and was directed to walk the store in detail and make decisions to ensure her team was in a position to succeed. None of Flores's feedback included statements indicating that Plaintiff was spending too much time doing non-exempt tasks, as opposed to simply doing exempt tasks inadequately. Thus, to the extent Plaintiff was informed about Defendant's displeasure with her performance, it was not specifically stated that her division of work between exempt and non-exempt tasks was the problem.

Ultimately, Plaintiff spent more than half her time engaged in non-exempt work, and Defendant did not show that it realistically expected Plaintiff to spend more than half of her time

on exempt tasks. Even if Plaintiff's substandard performance, as opposed to conditions at the store, were the cause of Plaintiff spending more than half her time on non-exempt tasks, Defendant did not inform Plaintiff of its displeasure with her performance until February 2021, and even then Defendant's disciplinary actions did not specifically focus on her allocation of time between exempt versus non-exempt tasks.

## III. CONCLUSION

For the above reasons, the Court finds that Plaintiff has proven by a preponderance that she was misclassified as an exempt employee during the relevant period. Accordingly, the Court **ENTERS** partial judgment in favor of Plaintiff and against Defendant. Defendant's Motion for Judgment on Partial Findings is **DENIED-AS-MOOT**. (Dkt. No. 86.)

1. The foregoing constitute the Court's findings of fact and conclusions of law under Fed. R. Civ. P. 52(a).

2. The Court **DIRECTS** the Clerk to enter judgment consistent with these findings.

**IT IS SO ORDERED.**